# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |
|---|---|
| ALEX ABADI  ⋮<br><br>　　PLAINTIFF,  ⋮<br>VS.  ⋮<br><br>DARKSTAR VISION, INC. F/K/A  ⋮<br>NOCTURNALUX INC.; AND JOSEPH F.  ⋮<br>SCALISI  ⋮<br><br>　　DEFENDANTS.  ⋮ | CIVIL ACTION # 1:26-cv-2246<br><br>JURY DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Alex Abadi, by and through his undersigned attorneys, respectfully alleges as follows for his complaint against Defendants DarkStar Vision, Inc. f/k/a Nocturnalux Inc., and Joseph F. Scalisi.

## PARTIES

1.　Plaintiff Alex Abadi ("Plaintiff" or "Abadi") is an individual residing in Austin, Travis County, Texas.

2.　Defendant DarkStar Vision, Inc. f/k/a Nocturnalux Inc. ("Defendant" or "DarkStar") is a Delaware corporation that registered to transact business in Texas and maintained its principal business operations at 9225 Bee Cave Road, Building A, Suite 101, Austin, Texas 78733. DarkStar's Texas registered agent resigned effective November 5, 2024, and DarkStar's Texas certificate/registration was forfeited on February 21, 2025. DarkStar may be served through the Texas Secretary of State pursuant to Federal Rule of Civil Procedure 4(h)(1)(A) and Texas Business

Organizations Code § 5.251, because it has failed to maintain a registered agent in Texas. The Texas Secretary of State's records and guidance recognize service through the Secretary of State when a Texas or foreign filing entity fails to appoint or maintain a registered agent.

3.     Defendant Joseph F. Scalisi ("Defendant" or "Scalisi") is an individual residing in, or doing business in, Texas. At all relevant times, Scalisi was DarkStar's founder, Chief Executive Officer, director, controlling person, and the "Key Holder" identified in DarkStar's Voting Agreement. In DarkStar's Texas Franchise Tax Public Information Report, Scalisi is listed as DarkStar's officer/director with a mailing address of 12600 Hill Country Road, Austin, Texas 78738. Scalisi may be served at 12600 Hill Country Road, Austin, Texas 78738, or wherever he may be found.

## NATURE OF THE CLAIMS

4.     This is a private-company securities-fraud and contract action arising from $650,000 that Plaintiff Alex Abadi paid to acquire equity in DarkStar Vision, Inc. ("DarkStar" or the "Company").

5.     In the summer of 2022, DarkStar and its founder and Chief Executive Officer, Defendant Joseph F. Scalisi, solicited Abadi to invest in DarkStar through a private offering of the Company's common stock.

6.     DarkStar's investor package represented a company valued at $100 million before the investment and an offering of common stock at $1.00 per share.

The package required participating investors to join DarkStar's Voting Agreement as "Stockholders."

9.      The transaction ultimately executed on August 3, 2022 subscribed for 5,000,000 shares of DarkStar common stock at $0.60 per share, for a stated purchase price of $3,000,000. A negotiated payment schedule required $500,000 at signing and provided additional time for payment of the balance.

10.      On August 4, 2022, Abadi caused $500,000 to be wired directly to DarkStar. The contemporaneous payment description stated: "INITIAL PAYMENT FOR STOCK PURCHASE."

11.      On November 1, 2022, Abadi caused another $150,000 to be wired to DarkStar.

12.      DarkStar accepted and used both payments. Its year-end 2022 financial statements treated the $650,000 as Common Stock equity. DarkStar personnel referred to Abadi as an investor. In February 2023, DarkStar's Board of Directors thanked Abadi in writing for being "our first investor" and demanded additional funding under the same August 3 subscription agreement. An April 2023 DarkStar capitalization table continued to identify "Gold Star" as holding 5,000,000 shares.

13.      But behind those representations, the transaction was materially different from what Abadi had been told. Among other things, Company records later obtained or reviewed by Abadi reflect that, only weeks before Abadi's purchase, DarkStar's board had assigned a fair-market value of $0.00001 per share to common stock and granted an insider 5,000,000 shares at that price. DarkStar did not disclose

that contemporaneous board valuation to Abadi before selling him the same number of common shares for a stated $3,000,000.

14. DarkStar also did not disclose that its operating bank account held less than $1,000 immediately before Abadi's first $500,000 wire, or the extent to which DarkStar's operations and expenses were intertwined with other Scalisi-associated ventures operating from the same premises.

15. After receiving Abadi's money, DarkStar's records show substantial expenditures supporting shared facilities and transactions associated with related ventures. Within months, DarkStar's accounting also changed: a Q1 2023 balance sheet moved $500,000 from Common Stock to "Loans From Shareholders," even though Abadi had never agreed to lend DarkStar money, had never executed a note or other loan instrument, and had never agreed to amend the subscription from equity to debt.

16. No written amendment authorized that change. No share certificate or equivalent confirmation of Abadi's paid-for equity was ever delivered to him.

17. When Abadi began asking for DarkStar's books and records in early 2023, including its general ledger, those requests were not fully honored. Through counsel, Abadi ultimately served a formal books-and-records demand and suspended additional payments pending disclosure of the Company's records.

18. DarkStar nevertheless continued to invoke the subscription agreement when seeking additional money from Abadi while simultaneously treating substantial portions of his equity as debt on its internal books.

19. In 2024, the contradictions became more serious. Scalisi presented a home-security product to Abadi as DarkStar's own product—the "DarkStar Shield"—using DarkStar's email, branding, personnel, and business channels. During that same period, the product and associated business began appearing under a new Scalisi-controlled business name, ShieldSOS.

20. On September 13, 2024, after Abadi requested the tax documents he expected as an equity holder, Scalisi expressly repudiated the equity transaction for the first time. Scalisi told Abadi that, after speaking with DarkStar's accounting administrator Adrian Lanch, Abadi was "technically . . . a lender and not a shareholder."

21. Abadi immediately rejected that assertion in writing and directed Scalisi back to the agreement the parties had signed.

22. DarkStar cannot simultaneously accept $650,000 for common stock, book that money as equity, call Abadi its first investor, list his position on its capitalization table, demand additional performance under the stock-subscription agreement, and then unilaterally convert the transaction into a loan and deny that he is a shareholder.

23. Abadi seeks, in the alternative, rescission and return of his $650,000 with the relief available by law, or enforcement and recognition of the equity rights for which he paid, together with damages caused by Defendants' securities fraud and common-law fraud.

## JURISDICTION AND VENUE

24.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Count 1 arises under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

25.    This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

26.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Texas-law and related claims because all claims arise from the same transactions, investment, payments, representations, and course of conduct.

27.    The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

28.    This Court has personal jurisdiction over Defendants because DarkStar operated in Texas and Scalisi personally conducted substantial business in Texas, and because the claims arise from transactions and communications centered in the Austin area.

29.    Venue is proper in the Western District of Texas under 15 U.S.C. § 78aa and 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred in this District.

30.    Venue in the Austin Division is independently consistent with the parties' transaction documents. Section 9.1 of the subscription agreement provides that proceedings arising under the agreement shall be brought in Texas courts located in Travis County or federal courts located there if subject-matter jurisdiction

exists. The Voting Agreement likewise selects state or federal courts in Austin and Travis County.

## CONDITIONS PRECEDENT

31.     All conditions precedent have been performed, have occurred, have been excused, or have been waived.

32.     To the extent any tender is required to obtain rescission, Abadi offers to make the tender required by law upon determination of the securities or rights to be tendered.

## BACKGROUND FACTS

**DarkStar Solicited Abadi to Purchase Common Stock**

33.     In May 2022, DarkStar provided Abadi with a confidential investor package for a private offering of DarkStar common stock.

34.     The investor package described an offering of up to 25,000,000 shares of common stock to accredited investors.

35.     The accompanying May 11, 2022 Memorandum of Terms represented a "Pre-Money Valuation" of $100,000,000 and an offering price of $1.00 per common share.

36.     The investor materials further represented that investors purchasing DarkStar shares would enter the Company's existing Voting Agreement and would be treated as "Stockholders."

37.     The materials were intended to induce prospective investors, including Abadi, to commit capital to DarkStar.

38.    Scalisi was personally involved in the solicitation and negotiations. He was DarkStar's founder and CEO and possessed extensive authority over the Company's board and affairs.

39.    Abadi reviewed DarkStar's materials and communicated repeatedly with Scalisi and DarkStar personnel concerning the proposed investment.

**DarkStar Did Not Disclose Material Facts Concerning Its Financial Condition and Common-Stock Valuation**

40.    Company records later obtained and reviewed by Abadi reflect that on or about July 1, 2022—approximately one month before Abadi's purchase, DarkStar's board approved an issuance of 5,000,000 shares of common stock to insider Murray Wikol at $0.00001 per share, for approximately $50, and stated a fair-market value of $0.00001 per share for purposes of that issuance.

41.    DarkStar did not disclose that board action or contemporaneous valuation to Abadi before accepting his agreement to purchase 5,000,000 shares at $0.60 per share.

42.    The omission was material. The difference between a contemporaneous board valuation of $0.00001 per common share and the $0.60 per share charged to Abadi was enormous, and a reasonable investor would consider the Company's own recent valuation and insider issuance important in deciding whether and on what terms to invest.

43.    DarkStar also did not disclose that the Company's principal operating account held only approximately $798 immediately before Abadi's first $500,000 wire.

44.    Abadi's money therefore did not enter a business with substantial

operating liquidity. His first payment immediately became the predominant source of cash available to the Company.

45. DarkStar and Scalisi also did not fairly disclose the extent to which DarkStar's business operations, premises, personnel, and expenditures overlapped with other ventures associated with Scalisi, including Zaps Labs or Zaps Audio and SkyBell-related operations.

46. Produced financial records later showed DarkStar paying substantial expenses for the shared 9225 Bee Cave Road premises and engaging in transactions associated with those related operations.

47. These facts were material to an investor evaluating both the $100 million valuation represented in the investor materials and the risk that newly invested capital would be used for purposes other than DarkStar's stand-alone operations.

**The August 3 Subscription and the "Gold Star Holdings" Name**

48. On August 3, 2022, Abadi executed DarkStar's Common Stock Subscription and Purchase Agreement.

49. The executed signature page states that the investment was for 5,000,000 shares at a total purchase price of $3,000,000, expressly calculated as shares multiplied by $0.60.

50. Section 9.14 of the executed agreement contained a negotiated payment schedule. It called for $500,000 at signing and provided up to 18 months for the

remaining balance, subject to an emergency-payment provision and other negotiated terms.

51.     Section 9.14 also expressly included a seat for the investor on the Company's Board of Advisors.

52.     The subscription agreement was accepted for DarkStar by Scalisi in his capacity as President and Chief Executive Officer.

53.     The signature line identified the investor as "Gold Star Holdings, LLC — Alex Abadi, Manager."

54.     At the time, Abadi had not formed an LLC under the exact name "Gold Star Holdings, LLC." The name was used in the transaction as the anticipated vehicle through which Abadi was making his investment.

55.     Abadi was the human principal behind that designation. He negotiated the investment, signed the agreement, personally dealt with DarkStar, and supplied all of the consideration that DarkStar ever received on the subscription.

56.     DarkStar knew it was dealing with Abadi. The investor address in the agreement was Abadi's personal Austin address. DarkStar corresponded directly with him, accepted his personal funds, and subsequently addressed shareholder and investment communications to him.

57.     The associated Adoption Agreement to the Voting Agreement likewise identified Abadi as the signatory for "Gold Star Holding, LLC." The box identifying the holder as "a new party who is a new Stockholder" was checked, and DarkStar accepted that Adoption Agreement.

58.     A different entity, Goldstar Capital Holdings LLC, was not formed until August 15, 2022, after the subscription was already executed and after the first $500,000 payment.

59.     Abadi is the sole member and manager of Goldstar Capital Holdings LLC.

60.     Goldstar Capital Holdings LLC is not the source of the investment at issue. It had no bank account from which either investment payment could have been made, did not receive or disburse the invested funds, and does not claim ownership of the subscription or the DarkStar shares.

61.     To the extent the "Gold Star Holdings, LLC" designation creates any ambiguity concerning the nominal contracting party, Abadi pleads in the alternative that he acted as the promoter and real principal behind a contemplated but unformed investment vehicle; that he is individually bound by and entitled to enforce the agreement he signed and personally performed; and/or that the instrument should be reformed to reflect the actual purchaser and party whose money DarkStar knowingly accepted.

**Abadi Paid DarkStar $650,000 for Stock**

62.     On August 4, 2022, the day after the agreement was executed, Abadi caused $500,000 to be wired to DarkStar's Wells Fargo account from an account under his control.

63.     The contemporaneous wire description states: "INITIAL PAYMENT FOR STOCK PURCHASE."

64.    DarkStar accepted the payment and did not reject the subscription or return the money.

65.    On November 1, 2022, Abadi caused another $150,000 to be wired from the same Bank of America account to the same DarkStar Wells Fargo account.

66.    The Bank of America interface referred to the account by different shorthand at different times, "Nueces" and "Alex 7532," but those labels referred to the same underlying account.

67.    The November wire included the payment-detail memo "GOLDSTAR CAPITAL HOLDINGS PAYMENT." That memo was descriptive language entered by Abadi. It did not mean that Goldstar Capital Holdings LLC owned the source account or supplied the funds.

68.    DarkStar accepted that payment as well.

69.    Abadi therefore paid DarkStar a total of $650,000.

70.    He never executed a promissory note, loan agreement, interest agreement, maturity schedule, or other instrument agreeing that any portion of those payments constituted a loan to DarkStar.

**DarkStar Initially Recorded the $650,000 as Equity**

71.    DarkStar's own year-end 2022 financial statements recorded Abadi's $650,000 under Common Stock equity.

72.    Those same financial statements separately identified purported shareholder loans, demonstrating that DarkStar's accounting differentiated debt from equity when it chose to do so.

73. On November 1, 2022, the same date as Abadi's second payment, a DarkStar employee referred to him in Company correspondence as DarkStar's "angel investor."

74. No contemporaneous communication produced from 2022 characterized Abadi's $650,000 as a loan.

**DarkStar Then Sought a "New Deal Structure" and Reclassified the Equity**

75. On January 20, 2023, a DarkStar employee wrote to Abadi that "Joe would like to negotiate a new deal structure."

76. Abadi never agreed to replace his common-stock investment with a loan and never executed a new deal structure.

77. Nevertheless, a DarkStar Q1 2023 balance sheet subsequently reclassified $500,000 of the investment from Common Stock to "Loans From Shareholders."

78. Abadi did not authorize that reclassification.

79. No written amendment to the subscription agreement authorizing an equity-to-debt conversion has been produced.

80. Section 9.12 of the subscription agreement requires amendments or waivers to be made by a written instrument referencing the agreement and signed by the Company and the holder.

81. No such instrument exists.

**DarkStar's Board Simultaneously Confirmed Abadi's Investor Status and Enforced the Subscription Agreement**

82. The reclassification is also inconsistent with DarkStar's outward conduct.

83. On February 24, 2023, DarkStar's Board of Directors sent a letter to "Mr. Alex Abadi, Gold Star Holdings, LLC."

84. The letter opened: "We thank you for being our first investor and for your commitment to our vision and technology."

85. The Board then expressly invoked Section 9.14 of the agreement executed on August 3, 2022 and demanded additional emergency funding under that provision.

86. DarkStar thus affirmed the same stock-subscription agreement and Abadi's investor status when it sought additional money from him.

87. An April 26, 2023 DarkStar capitalization table likewise identified "Gold Star" as holding 5,000,000 shares out of 100,000,000.

88. That capitalization table divided the position into 1,083,333 shares labeled "vested" and 3,916,667 shares labeled "reserved."

89. The 1,083,333-share number corresponds approximately to $650,000 divided by the agreed $0.60 per-share price.

90. The executed subscription agreement itself contains no vesting or reserved-share provision applicable to Abadi's investment and no signed amendment created one.

91.     Even under DarkStar's later "vested/reserved" theory, however, its own capitalization table recognized that Abadi had fully paid for and held at least 1,083,333 shares.

92.     DarkStar never delivered a stock certificate, instrument, or equivalent book-entry confirmation to Abadi for even those paid-for shares.

**Abadi Repeatedly Requested the Books Before Paying Millions More**

93.     By early 2023, Abadi had begun requesting DarkStar's accounting records, including the general-ledger journal necessary to understand how his money had been spent.

94.     Abadi requested the general ledger journal and supporting financial records in January, February, and March 2023.

95.     Scalisi identified Adrian Lanch as the person in charge of DarkStar's books.

96.     DarkStar produced some partial financial information, but it did not produce the complete source accounting materials Abadi requested, including the general ledger journal, check copies, and source records sufficient to audit the use of Abadi's funds.

97.     On April 3, 2023, Abadi retained counsel to serve a formal books-and-records demand on DarkStar and Scalisi.

98.     The demand identified Abadi as a minority shareholder and derivative claimant, sought records concerning DarkStar and transactions involving related entities, and requested an inspection.

99.    The April 3 letter also notified DarkStar that Abadi would not provide further funding until he could review the books and determine whether mismanagement had occurred.

100.    The inspection date referenced in the April 3 letter did not go forward after Abadi's side sought to reschedule because his forensic accountant was unavailable.

101.    Abadi does not allege that Defendants refused or ignored a May 1, 2023 inspection.

102.    Rather, DarkStar never produced the complete records repeatedly requested before and after the statutory demand, including the general ledger journal, check copies, and complete source accounting records necessary to determine how Abadi's funds were used.

103.    Later productions from DarkStar were partial and incomplete. They did not cure DarkStar's failure to provide the records necessary to understand the equity-to-loan reclassification and use of Abadi's investment.

104.    Abadi did not pay the remaining $2.35 million contemplated by the subscription agreement.

105.    DarkStar, however, had already accepted $650,000 without delivering any certificate or other evidence of the paid-for equity, and its own accounting records purported to change the character of that investment without Abadi's agreement.

106.    To the extent further payment would otherwise have been due, Abadi pleads that his further performance was excused by DarkStar's prior material breaches and repudiation of the equity bargain.

107.    In the alternative, if the subscription is rescinded because of Defendants' fraud, the unpaid future purchase-price obligation is extinguished with the rescinded transaction.

## Abadi Continued to Assert His Shareholder Status, and DarkStar Did Not Correct Him

108.    On October 12, 2023, Abadi emailed DarkStar administrator Adrian Lanch, copying Scalisi, asking for his 2022 DarkStar Form K-1.

109.    Neither Scalisi nor Lanch responded that Abadi was supposedly a lender rather than a shareholder.

110.    That silence was consistent with DarkStar's prior treatment of Abadi as an investor and shareholder and inconsistent with the position Defendants would later adopt.

## In 2024, Scalisi Continued to Present the "Shield" Product as DarkStar's Business

111.    On February 20, 2024, Scalisi contacted Abadi concerning a home-security product and told him: "We will be launching our first product line in the next 90 days."

112.    Scalisi asked about using Abadi's Kyle-area facilities to provide pick-pack-and-ship services for the product.

113. On February 23, 2024, Scalisi emailed Abadi from his joe@darkstarvision.com address and asked him to review a pitch deck for "the DarkStar Shield device."

114. Scalisi signed that email as DarkStar's "CEO/Founder."

115. DarkStar's sales materials likewise branded the product "DARKSTAR SHIELD," described "DarkStar Active Deterrent Technology," and identified DarkStar Vision Inc. as the company behind the product.

116. Those communications gave Abadi every reason to understand that the Shield product was a DarkStar business and asset.

117. During summer 2024, however, the same business increasingly appeared under the name ShieldSOS.

118. On July 8, 2024, Scalisi asked to use Abadi's warehouse address for an Amazon account and stated that "we'd also like to rent an office space at your facilities for shield."

119. On July 31, 2024, Scalisi specifically asked for a lease agreement for "shieldSOS LLC" for a business license.

120. In August 2024, Scalisi insisted that the proposed lease be placed in ShieldSOS LLC's name and began communicating from a shieldsos.com email address.

121. These events were materially different from the way Scalisi had presented the same product earlier that year as the "DarkStar Shield" and DarkStar's "first product line."

122. Later records further reflected that a patent concerning the active-deterrent product, U.S. Patent No. 12,400,533, claimed a March 27, 2024 priority date and ultimately issued in 2025 to ShieldSOS LLC rather than DarkStar.

123. Abadi reserves all rights arising from the migration or diversion of DarkStar business, intellectual property, assets, and corporate opportunities to ShieldSOS or any other Scalisi-controlled entity. Those claims are not required to adjudicate the direct causes of action asserted in this Complaint.

**September 13, 2024: Defendants Finally Denied the Equity**

124. On September 13, 2024, Abadi again requested the tax records he expected to receive as a shareholder.

125. Scalisi responded in writing: "I was speaking with Adrian and technically you're a lender and not a shareholder yet until you convert we can't issue a K-1."

126. That was the first express statement to Abadi that Defendants contended his stock purchase had somehow become a loan.

127. Abadi immediately rejected the assertion, responding in substance that it was not true, that he was a shareholder, and that Scalisi and Lanch should read the agreement the parties had signed.

128. The September 13 statement was incompatible with the executed Common Stock Subscription and Purchase Agreement; the August 4 wire stating "Initial payment for stock purchase"; DarkStar's year-end 2022 accounting of the funds as Common Stock; DarkStar's February 2023 "first investor" letter; DarkStar's

enforcement of § 9.14 of the subscription agreement; DarkStar's April 2023 capitalization table; and Abadi's October 2023 request for shareholder tax information, which Scalisi received without correcting his asserted status.

129.   DarkStar has never returned the $650,000.

## DISCOVERY, CONCEALMENT, AND TIMELINESS

130.   This action is filed within five years of both of Abadi's 2022 purchases.

131.   Abadi also brings his federal securities-fraud claim within two years of the September 13, 2024 express repudiation of his equity.

132.   Defendants may contend that Abadi should have discovered the 2022 securities fraud earlier because he began investigating DarkStar's use of corporate funds in 2023.

133.   That contention conflates different facts and different wrongs.

134.   In early 2023, Abadi had concerns about corporate expenditures, reporting, and possible mismanagement after his investment. Those concerns caused him to exercise diligence: he repeatedly requested records, retained counsel, retained accounting assistance, and demanded access to the Company's books before putting additional millions of dollars into the Company.

135.   DarkStar did not respond to that diligence by telling Abadi his investment had never been equity. It did the opposite.

136.   DarkStar's year-end books treated the funds as Common Stock.

137.   Its Board called him "our first investor."

138. Its Board demanded more money from him under the stock-subscription agreement.

139. Its capitalization table continued to carry his 5,000,000-share position.

140. When Abadi requested a K-1 in October 2023, Scalisi received the request without telling him he was supposedly a lender.

141. And in early 2024, Scalisi continued to present the Company's new flagship product to Abadi as DarkStar's "first product line" and the "DarkStar Shield."

142. The concealed July 2022 board issuance and fair-market-value determination were not disclosed to Abadi when he invested and were uncovered only later through the review of DarkStar's corporate materials.

143. The internal equity-to-loan accounting likewise was not a transaction to which Abadi consented or one that Defendants disclosed to him when it was undertaken.

144. Abadi could not discover facts that Defendants withheld merely because he had begun asking the questions necessary to uncover them.

145. At minimum, when a reasonably diligent investor would have discovered the facts constituting the 2022 securities violation—including facts supporting scienter—is a disputed factual issue that cannot properly be resolved by converting Abadi's diligent investigation into knowledge of facts that DarkStar continued to contradict or conceal.

## COUNT 1: SECURITIES FRAUD

146.    Abadi realleges and incorporates herein the foregoing paragraphs.

147.    In connection with Abadi's purchase of DarkStar common stock, DarkStar and Scalisi, directly and through persons acting at their direction, used interstate emails, communications, banking facilities, and wire transfers.

148.    Defendants made materially misleading statements and omitted material facts necessary to make their statements concerning the investment not misleading.

149.    Among other things, DarkStar's investor materials represented a $100 million pre-money valuation and offered common stock to investors who would become DarkStar "Stockholders."

150.    In the executed transaction, DarkStar agreed to sell Abadi 5,000,000 shares for $3,000,000, accepted the agreement through Scalisi, and accepted $650,000 paid pursuant to that transaction.

151.    In making and communicating those representations and accepting Abadi's investment, Defendants failed to disclose, among other material facts: the July 2022 board determination assigning a $0.00001-per-share fair-market value in connection with an insider issuance of the same number of common shares; DarkStar's extraordinarily limited operating cash immediately before Abadi's investment; the extent to which DarkStar's operations and expenses were intertwined with other Scalisi-associated ventures; the risk that newly invested capital would be used to support shared or affiliate-related expenses rather than a

financially separate DarkStar operation; and facts inconsistent with the valuation and economic picture conveyed to Abadi in connection with the offering.

152. These were not immaterial details. A reasonable investor deciding whether to pay hundreds of thousands or millions of dollars for private-company common stock would consider each important.

153. Defendants' omissions also rendered the valuation and offering information provided to Abadi materially misleading. A $100 million pre-money valuation and premium-priced common-stock offering presented a materially different picture when divorced from the Company's own near-contemporaneous insider valuation, near-empty operating account, and financial entanglements.

154. Defendants acted with scienter.

155. Scalisi was not a remote employee. He founded DarkStar, served as its CEO, participated in the board process, controlled its management, had contractual authority to designate its board, personally negotiated with Abadi, and personally accepted the subscription on DarkStar's behalf.

156. Scalisi therefore knew, or was at least severely reckless in disregarding, DarkStar's true financial condition, its board's recent common-stock valuation and issuances, its affiliate relationships, and the manner in which new investor money would be used.

157. The events following the purchase reinforce the inference of scienter. After accepting $650,000 as a stock investment, DarkStar initially recorded the money as Common Stock; sought to negotiate a "new deal structure"; moved $500,000

into "Loans From Shareholders" without Abadi's consent; continued to enforce the original subscription when seeking additional money; continued to represent Abadi as an investor on its outward-facing documents; and ultimately repudiated the equity and called him a lender.

158.    The inference that Defendants knowingly or recklessly induced Abadi to invest without disclosing material facts, while reserving for themselves the ability later to alter or deny his equity treatment, is cogent and compelling when the allegations are considered collectively.

159.    Abadi actually relied on the investor materials, the nature of the transaction as a purchase of common stock, the valuation and Company information presented to him, and Defendants' failure to disclose the material contrary facts described above.

160.    Had the material facts been truthfully disclosed, Abadi would not have made the purchases on the terms he did.

161.    Abadi suffered economic loss. He paid $650,000 for private-company equity that Defendants later denied existed and for an enterprise whose undisclosed financial condition and practices materially impaired the value of the investment.

162.    The concealed risks materialized. DarkStar consumed the invested funds, lacked substantial independent operating capital, purported to reclassify equity as debt, failed to honor Abadi's ownership rights, and ultimately denied that the stock purchase created stock ownership.

163. Defendants' misrepresentations, omissions, and the conditions concealed by them were substantial factors in causing the loss of Abadi's investment and the value of the securities he purchased.

164. Abadi is entitled to recover his damages under Section 10(b), Rule 10b-5, and applicable law.

## COUNT 2: CONTROL-PERSON LIABILITY

165. Abadi realleges and incorporates herein the foregoing paragraphs.

166. DarkStar is primarily liable for the securities-law violations alleged in Count 1.

167. At all relevant times, Scalisi directly or indirectly controlled DarkStar within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

168. Scalisi was DarkStar's founder and CEO.

169. The Voting Agreement expressly designated Scalisi as the "Key Holder" and gave him authority to determine the size and composition of DarkStar's board while he or his affiliates continued to hold shares.

170. Scalisi possessed the power to control the specific transaction and activity giving rise to Count 1. He participated personally in the solicitation, had authority over DarkStar's offering and corporate affairs, and personally signed DarkStar's acceptance of Abadi's subscription.

171. Scalisi later personally communicated DarkStar's repudiation of the equity transaction.

172.    Accordingly, Scalisi is jointly and severally liable to the extent provided by Section 20(a), subject to the statutory defenses on which he bears the applicable burden.

## COUNT 3: TEXAS SECURITIES ACT VIOLATIONS

173.    Abadi realleges and incorporates herein the foregoing paragraphs.

174.    The DarkStar common stock offered and sold to Abadi constitutes a "security" within the Texas Securities Act.

175.    DarkStar was the seller and issuer of that security.

176.    DarkStar offered and sold the security to Abadi by means of materially untrue or misleading statements and omissions, including the valuation, capitalization-related, financial-condition, insider-issuance, and affiliate-use facts alleged above.

177.    The omitted information was necessary to make the circumstances under which the security was offered and sold not misleading.

178.    Abadi did not know of the material untruths and omissions when he purchased the securities.

179.    DarkStar is therefore liable under Texas Government Code § 4008.052.

180.    Scalisi directly or indirectly controlled DarkStar and the transaction at issue and is jointly and severally liable under Texas Government Code § 4008.055, subject to any statutory defense he can prove.

181.    Abadi seeks rescission under Texas Government Code § 4008.056.

182.    Abadi has received no dividends, distributions, interest, or other income on account of the DarkStar security.

183.    To the extent necessary to effect rescission, Abadi offers and will tender to DarkStar any interest, rights, or securities that the Court determines he acquired through the transaction.

184.    Abadi therefore seeks recovery of the consideration he paid, $650,000, together with interest at the rate provided by law, less any amounts required by statute, and the costs and reasonable attorney's fees the Court determines equitable under Texas Government Code § 4008.060.

185.    Alternatively, if rescission is unavailable or no longer equitable when judgment is entered, Abadi seeks the damages authorized by the Texas Securities Act.

**COUNT 4: COMMON-LAW FRAUD AND FRAUDULENT INDUCEMENT**

186.    Abadi realleges and incorporates herein the foregoing paragraphs.

187.    Defendants made material representations to Abadi concerning the DarkStar investment, including representations concerning DarkStar's valuation, the sale of common stock, and the stockholder status that would accompany the investment.

188.    Defendants also supplied partial information concerning DarkStar's valuation, business, financing, and investment opportunity while failing to disclose material facts necessary to prevent those disclosures from being misleading,

including the board's near-contemporaneous insider valuation and issuance, DarkStar's true cash condition, and material financial entanglements.

189. The representations and omissions were material.

190. Defendants knew the representations were false or misleading, or made them recklessly without knowledge of their truth, and knew the omitted facts.

191. In particular, Scalisi was personally positioned to know DarkStar's board actions, financial condition, affiliate relationships, offering structure, and use of Company funds.

192. Defendants intended that Abadi rely on the representations and omissions and invest substantial sums in DarkStar.

193. Abadi did so. He relied on Defendants' representations and the materially incomplete picture they presented and paid $650,000.

194. Abadi's reliance was justifiable. The concealed facts concerned internal board actions, Company banking and accounting, and affiliate relationships that were peculiarly within Defendants' knowledge and were not disclosed in the transaction documents.

195. The agreement's provisions concerning Abadi's independent legal and tax advice do not purport to disclose or establish the truth of Defendants' factual representations concerning DarkStar itself.

196. Defendants' fraud caused Abadi actual damages, including the loss of the $650,000 invested and loss of the benefit of the equity bargain, in an amount to be determined under the applicable measure of damages.

197. Defendants' subsequent conduct—including the unauthorized reclassification of the investment and eventual denial of Abadi's shareholder status— also demonstrates that the fraud was knowing or, at minimum, reckless.

198. Abadi seeks exemplary damages against the persons and entities for whom such damages are available upon the findings required by Texas law.

## COUNT 5: BREACH OF CONTRACT

199. Abadi realleges and incorporates herein the foregoing paragraphs.

200. The August 3, 2022 Common Stock Subscription and Purchase Agreement constitutes a valid agreement accepted by DarkStar.

201. Abadi negotiated and signed the agreement through the anticipated "Gold Star Holdings, LLC" designation and personally supplied all consideration DarkStar received under it.

202. DarkStar knowingly accepted Abadi's personal performance.

203. DarkStar thereafter repeatedly affirmed the agreement and Abadi's rights under it, including by retaining the $650,000; recording the payments as Common Stock; calling Abadi its "first investor"; invoking § 9.14 to demand additional performance from him; and listing his equity on its capitalization table.

204. To the extent necessary, Abadi pleads that he is individually entitled to enforce the agreement as the person who entered and performed the preformation transaction, or alternatively seeks reformation of the nominal subscriber name to reflect the parties' actual transaction.

205. Abadi performed by paying $650,000.

206. DarkStar breached the agreement by, among other things, failing to issue or recognize the equity corresponding to Abadi's payments; failing to provide any certificate, instrument, or book-entry confirmation for the paid-for shares; purporting to reclassify the stock investment as a shareholder loan without a signed amendment; refusing to recognize Abadi as a shareholder; failing to provide the bargained-for advisory-board seat; and ultimately repudiating the central nature of the transaction as an equity investment.

207. Section 9.12 required any amendment of the subscription agreement to be in a signed writing. No signed writing converted Abadi's investment to debt or created the later "vested/reserved" structure appearing on DarkStar's capitalization table.

208. DarkStar's breaches were material because they went to the essence of the bargain: whether Abadi was buying equity at all.

209. DarkStar's material breaches excused Abadi from further performance to the extent further performance otherwise became due.

210. Alternatively, Abadi is entitled to damages reflecting the equity for which he actually paid, and DarkStar's own capitalization table establishes a minimum paid-for position of approximately 1,083,333 shares at the agreed $0.60 price.

211. Abadi seeks actual damages, specific and equitable relief where appropriate, and reasonable attorney's fees, costs, and necessary disbursements under § 9.11 of the subscription agreement.

## COUNT 6: DECLARATORY JUDGMENT, REFORMATION, AND EQUITABLE RELIEF

212.    Abadi realleges and incorporates herein the foregoing paragraphs.

213.    An actual and immediate controversy exists concerning the identity of the purchaser, the enforceability of the subscription, the character of the $650,000 payment, and Abadi's resulting equity rights.

214.    DarkStar accepted the agreement and Abadi's money as a stock transaction but later asserted through Scalisi that Abadi was merely a lender.

215.    Abadi seeks declarations under 28 U.S.C. §§ 2201–2202 that: Abadi is the real party in interest and purchaser with respect to the August 3, 2022 subscription and the $650,000 paid pursuant to it; the use of the anticipated but unformed "Gold Star Holdings, LLC" name does not permit DarkStar to retain Abadi's performance while denying the corresponding contractual and securities rights; to the extent reformation is necessary, the agreement should be reformed to reflect Abadi as the actual investor and party who negotiated, signed, and personally performed the transaction; the purported reclassification of Abadi's stock investment to "Loans From Shareholders" was unauthorized and did not alter Abadi's legal rights; and DarkStar's position that Abadi is "a lender and not a shareholder" is inconsistent with the parties' transaction and is legally ineffective.

216.    Abadi further seeks declarations that, if DarkStar's prior material breaches excused the remaining purchase-price performance, Abadi is entitled to the rights arising from the 5,000,000-share subscription, subject to such offsets or equitable adjustment as the Court determines lawful; alternatively, and at a

minimum, Abadi holds the fully paid-for equity corresponding to his $650,000 payment—including the approximately 1,083,333 shares DarkStar's own capitalization table identified as "vested"; and DarkStar must correct its books and records and recognize the equity rights established by the Court.

217.    Abadi further requests specific performance or other equitable orders necessary to implement those declarations.

218.    These remedies are pleaded in the alternative to rescission. Abadi does not seek an impermissible double recovery and may elect among inconsistent remedies when required by law.

## COUNT 7: MONEY HAD AND RECEIVED

219.    Abadi realleges and incorporates herein the foregoing paragraphs.

220.    This count is pleaded only in the alternative to enforcement of the subscription and recognition of Abadi's equity.

221.    DarkStar received $650,000 directly from Abadi.

222.    DarkStar has retained and used that money.

223.    If DarkStar's position is that no enforceable equity transaction exists and Abadi acquired no corresponding stock rights, then DarkStar possesses money that, in equity and good conscience, belongs to Abadi.

224.    DarkStar cannot retain the $650,000 while simultaneously denying the consideration for which it was paid.

225.    Abadi therefore seeks restitution of $650,000, together with prejudgment interest and other relief permitted by law.

**ATTORNEY'S FEES, COSTS, AND INTEREST**

226.    Abadi seeks attorney's fees, costs, and necessary disbursements under § 9.11 of the subscription agreement for claims enforcing or interpreting that agreement.

227.    Abadi also seeks the costs and reasonable attorney's fees authorized, where equitable, under Texas Government Code § 4008.060 and Tex. Civ. Prac. & Rem. Code § 38.001.

228.    Abadi seeks prejudgment and post-judgment interest as permitted by applicable law.

**PRAYER**

WHEREFORE, Plaintiff Alex Abadi respectfully requests that the Court issue citation and, after proceedings according to law, enter judgment in his favor and against Defendants as follows:

A.    awarding damages under Section 10(b) of the Exchange Act and Rule 10b-5 in an amount determined at trial;

B.    holding Scalisi liable as a control person under Section 20(a) to the extent provided by law;

C.    rescinding the DarkStar securities transaction under Texas Government Code §§ 4008.052 and 4008.056 and awarding Abadi the $650,000 consideration paid, plus statutory interest, less any amount required by law;

D.    alternatively awarding the damages available under the Texas Securities Act;

E.    awarding actual damages for common-law fraud and fraudulent inducement;

F.    awarding exemplary damages upon the findings and in the amounts permitted by Texas law;

G.    awarding damages and/or specific performance for DarkStar's breaches of the subscription agreement;

H.    declaring and reforming the parties' rights as requested in Count 6 and ordering DarkStar to correct its records and recognize the equity position determined by the Court;

I.    alternatively, awarding restitution of $650,000 on Abadi's money-had-and-received claim;

J.    awarding reasonable and necessary attorney's fees, costs, and expenses under the subscription agreement and other applicable law;

K.    awarding pre- and post-judgment interest;

L.    awarding all other legal and equitable relief to which Abadi proves himself entitled; and

M.    granting trial by jury on all claims and issues triable to a jury that are not subject to a valid and enforceable contractual jury waiver.

Respectfully submitted,

**AMINI & CONANT, LLP**
1204 San Antonio Street, Second Floor
Austin, Texas 78701
t: (512) 222-6883
f: (512) 900-7967
e: service@aminiconant.com

By: *Joshua Eames-Cepero*

Joshua Eames-Cepero
State Bar No. 24109826
josh@aminiconant.com
R. Alex Conant
State Bar No. 24074061
alex@aminiconant.com

*Counsel for Plaintiff Alex Abadi*